In the Matter of ENERGY COOPERA-
TIVE, INC., Debtor.

Appeals of KOCH REFINING CO., Koch
Fuels, Inc., Wood River Oil & Refining
Co., Conoco Inc., Mobil Oil Corpora-
tion, Chevron U.S.A. Inc., Gulf Oil Cor-
poration, Socap International, Ltd.,
U.S.A. Rookwood, Inc., Kerr–McGee
Refining Corp., Triangle Refineries,
Peerless Distributing, Valero Refining
f/k/a Saber Refining, Union Oil Com-
pany of Calif., Tenneco Oil Company,
Oils, Inc., Bell Fuels, Inc., Moore
McCormack, Enron Oil Trading &
Transportation Company, and Societe
Nationale Pour La Recherche, La Pro-
duction, Le Transport, La Transforma-
tion, et al Commercialisation des Hy-
drocarbures ("Sonatrach"),[1] Appel-
lants.

Nos. 88–2408, 88–2409 and 88–2483.

United States Court of Appeals,
Seventh Circuit.

Argued March 27, 1989.

Decided Sept. 28, 1989.

As Amended Oct. 10, 1989.

1. Exxon Corporation was originally a party to this appeal. By motion of March 20, 1989, Exxon sought leave to withdraw from the appeal and on April 19, 1989, the Trustee filed a motion requesting that Exxon's motion be granted. Exxon Corporation's Motion for Leave to Withdraw from Appeal is hereby granted.

Louis W. Levit, Richard J. Mason, Levit & Mason, Michael R. Hassen, Joni L. Goldstein, Douglas J. Lipke, Lord, Bissell & Brook, Nathan P. Eimer, Sidley & Austin, Harry Coven, Gould & Ratner, Michael L. Shakman, Miller, Shakman, Nathan & Hamilton, Alan I. Greene, G. Scott Falknor, Chadwell & Kayser, Joseph L. Matz, Holleb & Coff, Joni L. Goldstein, Barbara Bertok, J. Robert Stoll, Stuart M. Rozen, Mary T. Donoghue, Mayer, Brown & Platt, Joanne M. Harmon, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Chester H. Foster, Jr., Arnstein & Lehr, Chicago, Ill., for appellants.

Donald R. Cassling, Jenner & Block, Nathan P. Eimer, Sidley & Austin, Matthew J. Botica, Mary Kay McCalla, Hopkins & Sutter, Michael L. Shakman, Judith S. Wolicki, Miller, Shakman, Nathan & Hamilton, Stephen Schostok, Laser, Schostok, Kolman & Frank, David Heller, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Dennis M. O'Dea, Keck, Mahin & Cate, Louis W. Levit, Levit & Mason, Norman H. Nachman, Winston & Strawn, S.J. Adelman, Sonnenschein, Carlin, Nath & Rosenthal, David J. Fischer, Wildman, Harrold, Allen & Dixon, Aaron J. Kramer, Schiff, Hardin & Waite, J. Patrick Herald, Baker & McKenzie, A. Bruce Schimberg, Nathan P. Eimer, Sidley & Austin, Steven P. Handler, McDermott, Will & Emery, Jacob Pomeranz, Michael T.

Hannafan, Hannafan & Handler, Daniel M. Pelliccioni, Katten, Muchin & Zavis, Chicago, Ill., Patrick A. Murphy, Murphy, Weir & Butler, San Francisco, Cal., John R. Brandenburg, John K. Kallman, Rudnick & Wolfe, David Brown, Laurence H. Kallen, Arnstein & Lehr, James M. Breen, Chapman & Cutler, Chicago, Ill., M. McKevitt, Rosemont, Ill., W.H. Luking, Ross & Hardies, Milton L. Fisher, Mayer, Brown & Platt, Chicago, Ill., Michael J. Madigan, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Floyd Babbitt, Berman, Fagel, Haber, Maragos & Abrams, William E. Kelly, Pope, Ballard, Shepard & Fowle, Malcolm M. Gaynor, Schwartz, Cooper, Kolb & Gaynor, Jay A. Steinberg, Schiller, Klein & Steinberg, Pamela S. Hollis, Hollis & Johnson, N.H. Nachman, Nachman, Munitz & Sweig, Michael R. Hassan, Lord, Bissell & Brook, Chicago, Ill., for appellees.

Before BAUER, Chief Judge, KANNE, Circuit Judge, and HENLEY, Senior Circuit Judge.[2]

BAUER, Chief Judge.

These appeals are from orders entered by the district court in the Energy Cooperative, Inc. ("ECI") bankruptcy proceeding approving a Settlement Agreement and granting injunctive relief. The Settlement Agreement resolves nine lawsuits and several years of litigation. The parties to the Settlement Agreement are Jay A. Steinberg, the trustee in bankruptcy for ECI (the "Trustee"), the shareholders of ECI (known as the "Member–Owners"[3]), and the lending banks to ECI (the "Banks"[4]). The objectors to the Settlement Agreement, and the appellants in this case, are ECI creditors holding unsecured claims and

---

**2.** The Honorable J. Smith Henley, Senior Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

**3.** The Member–Owners are Farmers Union Central Exchange, Inc. Farmers Petroleum Cooperative, Inc., FCX, Inc., Landmark, Inc., Land O'Lakes, Inc. (individually and as successor to Midland Cooperatives, Inc.), MFA Oil Company and Tennessee Farmers Cooperative. FCX, Inc. settled with the Trustee in 1986 shortly after it commenced Chapter 11 bankruptcy proceedings and is not a party to this Settlement Agreement.

**4.** The Banks are Continental Illinois National Bank and Trust Company of Chicago ("Continental Bank") (individually and as administrator for Federal Deposit Insurance Corporation), First National Bank of Minneapolis, Consolidated Asset Management Company (as administrator for Federal Deposit Insurance Company, as successor to First National Bank and Trust Company of Oklahoma City), Bank of Montreal, Seattle–First National Bank, the First National Bank of Boston and St. Louis Bank for Cooperatives.

those companies which had been sued by the Trustee to recover alleged preferences under Section 547 of the Bankruptcy Code.

## I.

In 1976, the Member–Owners, eight regional agricultural cooperatives, formed ECI to secure a steady supply of refined petroleum products for their businesses. They owned 100% of ECI's stock, constituted ECI's entire board of directors and were ECI's principal customers. The Member–Owners executed three contracts with ECI that became the subject of later litigation between the Trustee and the Member–Owners. The Member Subscription Agreement (the "MSA") obligated the Member–Owners under certain conditions to purchase stock so that ECI had sufficient working capital to maintain set financial ratios. As part of their obligation under the MSA, the Member–Owners executed demand promissory notes in favor of ECI in 1980. The third contract, the Member Product Purchase Agreement (the "MPPA"), obligated the Member–Owners to purchase set quantities of petroleum product each year at competitive prices.

In 1981, ECI filed a voluntary petition under Chapter 11 of the Bankruptcy Code. At the time, it owed approximately $251 million to the Banks under loans secured by substantially all of ECI's assets. The Banks also loaned ECI approximately $16 million after the petition was filed. Most of ECI's assets were liquidated and $191 million was repaid to the Banks. The Banks then intervened in a lawsuit by the debtor-in-possession against the Member–Owners. The lawsuit alleged that the Member–Owners breached the MSA and the MPPA and owed approximately $42 million on certain promissory notes payable to ECI. In support of their right to intervene, the Banks claimed that ECI's rights under these contracts were assets of the ECI estate and that, in exchange for loans made to ECI, the Banks were granted security interests in all ECI assets.

In 1983, the Banks and the Member–Owners entered into a settlement. Under the terms of the settlement, the Member–Owners paid the Banks approximately $56 million in return for which the Member–Owners received a participation in the pre-petition and post-petition loans made by the Bank to ECI and the collateral securing those loans.

In 1984, ECI converted its Chapter 11 reorganization into a Chapter 7 liquidation. Among the many lawsuits the Trustee pursued to recover estate assets were the eight lawsuits filed against the Member–Owners and Banks. In the main lawsuit, the Trustee alleged that the Member–Owners breached their obligation under the MSA to purchase stock and sought damages of $164 million. He also sought to recover on the promissory notes which the Member–Owners had issued to ECI under the MSA and which ECI had assigned to the Banks. In addition, the Trustee asserted several other claims, including breach of the MPPA, breach of fiduciary duty, equitable subordination (based upon the settlement agreement between the Member–Owners and the Banks), and he sought to pierce the corporate veil by alleging that the Member–Owners were the "alter-ego" of ECI. The Trustee also brought seven separate preference lawsuits against the Banks and Member–Owners, seeking recovery of $17 million from the Banks and $50 million from the Member–Owners.

At the time of the settlement, the Trustee was holding $29 million which had been recovered in another settlement. The Banks asserted secured claims of at least $89 million (and depending upon how the interest would be calculated, the secured claim could total $158 million) against this $29 million. Thus, in order to make a distribution to the general creditors, the Trustee either had to defeat the Banks' liens, recover sufficient funds to satisfy them, or settle. The Trustee asked his chief counsel, Ronald Barliant (who became a Bankruptcy Judge in 1988), to evaluate the likely outcome of the litigation against the Banks and Member–Owners. Barliant found that the Trustee was likely to prevail on the promissory note claim and had a 40% chance of prevailing on the MSA claim, under certain circumstances. The Trustee,

however, had only a slight chance of prevailing on the MPPA claim, the alter ego claim, the equitable subordination claim, and the preference claims. Barliant concluded that "the single most likely result" if the case were litigated was that the Banks' secured claims "would swallow up everything" in the estate, thus preventing a distribution to general creditors.

On the basis of Barliant's assessment, the Trustee negotiated the Settlement Agreement at issue on this appeal with the Banks and the Member–Owners. The Trustee agreed to dismiss the eight lawsuits brought against the Banks and Member–Owners. Out of the $29 million presently held by the estate, the Trustee will pay $9 million to the Banks and Member–Owners. In exchange, the Banks agreed to release all claims to the remaining $20 million held by the ECI estate. In addition, they will waive all claims to future recoveries by the Trustee, including the recoveries in preference cases in which the Trustee is seeking over $90 million. The Settlement Agreement includes three other important provisions. It resolves the "Permian Litigation," *Energy Cooperative Inc., et al. v. Permian Corp., et al.*, No. 81 A 2075, which involves the disposition of ECI's inventory. Second, it triggers the agreement of Atlantic Richfield Company to subordinate $45 million of its $50 million claim until there has been a 25% distribution to unsecured creditors. Third, the Settlement Agreement includes a provision conditioning the settlement upon the entry of an injunction prohibiting all creditors and preference defendants from asserting claims against the Member–Owners which were found by the court to be the exclusive property of the ECI estate.

On January 28, 1988, the Trustee presented a motion to the district court seeking approval of the Settlement Agreement. The court scheduled a hearing on the motion for March 30th and sent notice of the proposed settlement to all creditors, preference defendants and parties in interest. The Settlement Agreement was endorsed by the Official Creditors Committee, which had been elected pursuant to 11 U.S.C. § 705. The settlement, however, was opposed by a number of parties who are the appellants in this case. Prior to the hearing, the Trustee, the Member–Owners and the Banks, each filed what the district court called "comprehensive submissions." The submissions set forth the strengths and weaknesses of the litigation claims, provided a summary of the evidence, and discussed the relevant law. The appellants were permitted to review the submissions, along with the pleadings and the court papers in the litigation between the Trustee and the Member–Owners. Furthermore, they were permitted to review the depositions and documents obtained during discovery and to depose the Trustee, Barliant, and an officer of Continental Bank. The appellants then filed written motions objecting to the proposed settlement agreement.

After conducting four days of hearings on the proposed agreement and reviewing the submissions of the Trustee, the Member–Owners, the Banks, and the appellants, Judge Kocoras issued an opinion approving the Settlement Agreement on July 5, 1988. In his twenty-four page opinion, he responded to each of the issues which the appellants raised in their objections to the settlement and outlined the benefits the estate would receive by virtue of the settlement. He concluded that the settlement was in the best interests of the estate. On July 22, 1988, Judge Kocoras issued the injunction upon which the Settlement Agreement was conditioned by the Member–Owners. The appellants filed separate appeals from the district court's orders and this court consolidated the appeals.

## II.

Appellants' first claim on appeal is that the district court erred by failing to follow the dictate of *In re American Reserve Corp.*, 841 F.2d 159 (7th Cir.1987). *American Reserve* sets forth the duties of a court when asked to evaluate a bankruptcy settlement: "[The judge] may not simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber stamp' the Trustee's proposal. The bankruptcy judge must apprise himself of

all facts necessary to evaluate the settlement and make an 'informed and independent judgment' about the settlement." *Id.* at 162 (*quoting Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re A & C Properties,* 784 F.2d 1377, 1383 (9th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986)). In support of their general claim that Judge Kocoras failed to "apprise himself of all facts" and failed to make an "independent and informed judgment," the appellants raise four issues. First, the appellants claim that the court did not require the Trustee to establish the amount of the Banks' secured claims. The amount of the principal owed, however, has never been contested. Of the $251 million that ECI owed on pre-petition loans, it repaid $191 million, leaving $60 million in outstanding principal. The Banks also loaned ECI $16 million after it filed for bankruptcy. At the time of the settlement the Banks were entitled to approximately $13 million in interest on that post-petition loan. The court thus found that the Banks had a secured claim of at least $89 million. The court recognized, however, that the Banks were probably entitled to interest on the pre-petition loan and that this amount could total approximately $69 million, depending upon the manner in which the assets of the estate would be distributed and the extent to which the Banks' claim was over-secured. Because the amount of interest could only be determined at a future date, the court did not assign a value to the interest owed but instead evaluated the settlement from the perspective that the Banks claims ranged between $89 million and $158 million. The court's decision to evaluate the settlement from this perspective in no way implies that the court merely "rubber-stamped" the Trustee's proposal.

The appellants' next contention is that the district court failed to assess the expense, inconvenience and delay engendered by the Trustee's litigation against the Member–Owners and Banks. The court, however, found that the "litigation being comprised is enormously complex, expensive to pursue, and inconvenient to the Trustee in his ability to pursue other estate claims." With a straight face, the appellants argue that "there was not a shred of evidence underlying [the court's conclusion]." The appellants make this statement despite the following facts: the litigation against the Member–Owners and Banks encompasses eight lawsuits; the main case includes seven claims for relief, in response to which the Member–Owners and Banks have raised five counterclaims and 50 affirmative defenses; and each claim raised and defense asserted presents numerous legal and factual issues. We simply cannot agree that there is "not a shred of evidence" to support the district court's conclusion.

Third, the appellants contend that the district court erred by not requiring evidence substantiating the Trustee's estimate of the likelihood and amount of future preference recoveries. (As part of the Settlement Agreement, the Banks released their claims to all future preference recoveries; thus, the value of the recoveries was relevant to determining the benefit the estate received from the settlement.) The Trustee, however, did present evidence concerning the value of future preference recoveries. In the litigation against the preference defendants (other than the Member–Owners and Banks), the Trustee sought to recover approximately $90 million. In these preference lawsuits, the Trustee enjoyed the statutory presumption of insolvency, 11 U.S.C. § 547(f), thus making recovery much more likely than in the preference litigation against the Banks and Member–Owners.[5] On the other hand, adverse precedent on the applicability of the bailment doctrine to oil exchange preference cases, *Fuel Oil Supply & Terminaling v. Gulf Oil Corp.,* 72 B.R. 752 (S.D.Tex.1987), *rev'd in part on other grounds,* 837 F.2d

---

5. In the litigation against the Banks and Member–Owners, the Trustee had to prove that the defendants had "reasonable cause to believe the debtor was insolvent." 11 U.S.C. § 547(b)(4)(B)(ii). A 1984 amendment deleted that requirement, but that amendment would not apply to this litigation.

224 (5th Cir.1988), could make recovery on these claims more difficult. On the basis of the foregoing facts, Barliant opined that the Trustee would recover "tens of millions" of dollars. (The district court, however, set the value at $15 million.) Thus the appellants' third contention, like the first two, is meritless.

Last, the appellants contend that the court merely "rubberstamped" Barliant's assessment of the merits of the Trustee's litigation against the Member–Owners and Banks. Barliant testified at the hearing and in his deposition that the only claim upon which the Trustee had a good chance of prevailing was the promissory note claim. In his opinion, the Trustee had only a 40% chance of prevailing on the MSA claim and an even smaller chance of prevailing on all the other claims against the Banks and Member–Owners. To prove a breach of the MPPA contract, the Trustee had to prove that the Member–Owners did not pay competitive prices for the petroleum products, which according to Barliant was a very difficult endeavor. Furthermore, in his opinion, the Member–Owners did pay competitive prices. With respect to the Trustee's attempt to pierce the corporate veil, Barliant testified that the Member–Owners observed corporate formalities and otherwise kept their identity separate from ECI's. He also opined that the Trustee would have problems trying to convince a jury that ECI, at $30 million, was undercapitalized. Barliant found that the claim for equitable subordination was not a strong one, because, among other problems, there was no allegation of wrongdoing. With respect to the preference claims, Barliant testified that the Trustee would have to prove that the Banks and Member–Owners knew or had reason to know that ECI was insolvent and that the Trustee probably would not be able to do this: the financial statements showed a net worth and the Trustee never discovered any evidence which would show that liabilities exceeded assets.

Before adopting Barliant's assessment of the Trustee's probability of success in the litigation against the Member–Owners, the district court reviewed the submissions of the parties on this matter and heard four days of testimony about it. The court also examined Barliant's review of the facts underlying the litigation against the Banks and Member–Owners and the method of analysis which he used to predict the Trustee's probability of success in the litigation. It is worth mentioning that at no point in time have the appellants objected to Barliant's assessment of the merits of the litigation being settled. Finding that "Judge Barliant made exactly the kind of studied effort necessary to the development of reliable opinions about success or failure in a complex lawsuit," the district court decided to adopt Barliant's assessment of the merits. The court's review of Barliant's efforts demonstrates that it did not merely "rubberstamp" the proffered assessment.

Thus the appellants' general allegation that the district court shirked its responsibility in approving the Settlement Agreement is nonsense. The court carefully responded to each of the appellants' objections to the settlement. When the court eventually did adopt the findings of the Trustee and Barliant, it did so only after review of their methods and reasons. Although the appellants may be unhappy with the decision of the court, there is no question that the district court fulfilled its duties under the dictates of *American Reserve*.

### III.

The appellants' second claim is that the settlement is not in the best interest of the estate and that therefore the district court should not have approved it. "Because the bankruptcy judge is 'uniquely positioned to consider the equities and reasonableness of a particular compromise,' [this court on appellate review] will not reverse that determination unless the bankruptcy judge abused his discretion." *American Reserve*, 841 F.2d at 162 (*quoting In re Patel*, 43 B.R. 500, 505 (N.D.Ill.1984) (other citations omitted)). The appellants have not met their burden of demonstrating that the district court in this bankruptcy proceeding abused its discretion.

■ The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate. *See, e.g., American Reserve,* 841 F.2d at 161; *In re A & C Properties,* 784 F.2d at 1380, 1382.

> Central to the bankruptcy judge's determination is a comparison of the settlement's terms with the litigation's probable costs and probable benefits. Among the factors the bankruptcy judge should consider in his analysis are the litigation's probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay (including the possibility that disapproving the settlement will cause wasting of assets).

*American Reserve,* 841 F.2d at 161 (*citing In re A & C Properties,* 784 F.2d at 1381; *In re Blair,* 538 F.2d 849, 851 (9th Cir. 1976)) (other citations omitted). The district court examined both the monetary and non-monetary benefits of the settlement. The court found that, at a minimum, the settlement was worth at least $40 million to the estate. The Banks' release of their secured claims allowed the estate to keep $20 million of the $29 million then held by the Trustee. The release also covered all future preference recoveries by the Trustee, which the court valued at a minimum of $15.5 million. After paying priority expenses, which the Trustee valued at ap-

proximately $10 million, the estate would have at least $25 million in unencumbered funds with which to pay the general unsecured creditors. This amount would enablé the general creditors to recover at least 25% of their claims against ECI. The settlement also triggers the ARCO subordination agreement, under which ARCO will subordinate $45 million of its $50 million unsecured claim against ECI until there is a 25% distribution to the general creditors. The court found that by virtue of the settlement agreement the estate would have to recover $4.5 million less than it would otherwise to make a 25% distribution. The court also recognized the significant non-monetary benefits of the settlement, including the fact that Trustee could begin to distribute estate funds to the unsecured creditors instead of paying these funds out for legal fees.

■ In the absence of a settlement, the court found that there would probably never be a distribution to the general creditors. At the time of the settlement, the Trustee held $29 million and the Banks had at least $89 million in secured claims. In order to make a distribution to the general creditors, the Trustee either had to recover sufficient funds to pay off the secured claims or defeat the liens. The only way that the Trustee could defeat the liens was to succeed on the equitable subordination claim, which, as discussed above, was unlikely.[6]

---

6. The appellants also argue that the amount of the Banks' secured claim should be reduced in accordance with the principle of *In re Gladstone Glen,* 739 F.2d 1233 (7th Cir.1984). In *Gladstone Glen,* the partners of the debtor partnership purchased the second mortgage on the debtor's principal asset, an apartment complex, at a steep discount. They then asserted the full amount of the second mortgage debt so as to squeeze out the third mortgage holder under a "cram down" plan. This court limited the partners' recovery on the second morgage to the amount paid by the partners plus interest.

In evaluating the amount of the Banks' secured claim, the district court rejected the appellants' contention that *Gladstone Glen* would apply to reduce the Banks' secured claims to the amount that the Member–Owners paid to participate in those claims. The appellants claim that this was error and ask us to evaluate the Settlement Agreement from the perspective that *Gladstone Glen* does in fact reduce the amount of the Banks' secured claims.

Our function, however, in reviewing the court's approval of a settlement agreement is not to decide the merits of individual issues. "[I]t is not the function of this court to determine the merits of a single contested issue but rather to determine whether the plan as a whole is equitable and fair in light of all of the issues which have been contested." *In re New York, New Haven & Hartford R. Co.,* 632 F.2d 955, 960 (2nd Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980). *See also Airline Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.,* 573 F.2d 960, 963 (7th Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (*quoting Patterson v. Stovall,* 528 F.2d 108, 114 (7th Cir.1976)) ("[T]his court has held that a district court in reviewing a settlement agreement 'should not attempt to decide the merits of the controversy ... [because] [a]ny virtue which may reside in a compromise is based upon doing away with the effect of such a decision.' ").

Thus, in order to make a distribution to the general creditors, the Trustee had to recover enough money to pay off the secured claims—which meant that after turning over the $29 million he held, the Trustee still had to recover at least $60 million and possibly as much as $127 million. The litigation against the Member–Owners was not going to generate that kind of income: the promissory note claim was the only claim upon which the Trustee was likely to succeed and it was worth only $42–$44 million. Barliant concluded, and the district court adopted his conclusion after review, that the probable result of litigating the case against the Member–Owners and Banks was that the Banks' claims "would swallow up everything." Because the settlement was far better than the likely outcome of the litigation, the district court approved the settlement.

The appellants do not challenge Barliant's assessment of the Trustee's likelihood of success in the litigation against the Banks and Member–Owners. Nor do they challenge the Trustee's conclusion that if the litigation turns out as Barliant predicts, the Trustee will lose all $29 million currently held by the estate plus a substantial amount of future preference recoveries. In so many words, their principal argument against the court's approval of the settlement agreement is that the agreement does not, but should, read like an accountant's balance sheet. In other words, the appellants contend that what the estate gives up by virtue of the settlement *must* equal what the estate receives by virtue of the settlement. Thus, a settlement value should have been assigned to *each* claim brought against the Banks and Member–Owners and a settlement value should have been assigned to *each* of the Banks secured claims. After netting these claims out, the difference should be equal to the benefit that the estate receives by virtue of the settlement. For example, Barliant did not assign a settlement value to the Trustee's alter ego claim, which sought damages of approximately $300 million. Instead, he

concluded that the Trustee had little chance of success on this claim. The appellants contend that the district court should have required that a value be assigned, even if the Trustee had only a 10% chance of success on this claim. Assuming theoretically that the Trustee did have a 10% chance of success, then the alter ego claim had a settlement value of $30 million. Under the appellants' suggested methodology, then, the Banks and Member–Owners would have to come up with $30 million in consideration or the estate would have to receive a $30 million dollar benefit from somewhere in order to settle just this one claim.

This is the methodology that the appellants would have the district court follow when approving a settlement agreement. The world of settlements, however, does not read like a balance sheet—nor should it. Assigning value to contested claims cannot be done with the same precision as assigning value to a bill for the receipt of goods. Who is to say whether the Trustee has a 10% or a 20% chance of recovering on the alter ego claim? Under the appellants' methodology, that 10% difference is worth $30 million. Furthermore, assuming theoretically that the alter ego claim is in fact worth $30 million, inducing the Member–Owners to actually pay $30 million for it in practice is quite another matter. The appellants' myopic valuation method also fails to take into account that the burdens of litigation do not fall evenly in this kind of a situation. Delay inures to the benefit of the Member–Owners and Banks because the Trustee seeks to collect from them. Furthermore, the Banks and Member–Owners are in a better position to bear the burden of litigation costs. The Trustee's resources are more limited and strategic decisions are influenced by the fact that for each dollar spent on litigation, there is one less dollar available for distribution to general creditors. Courts thus do not require the use of a rigid mathematical formula to set dollar values on disputed claims because to do so "would create an illusion of

Thus the district court did not err by refusing to apply *Gladstone Glen* automatically to the Banks' claims. Its application was a matter that

the Trustee would have had to litigate along with all of the other claims against the Banks and Member–Owners.

certainty where none exists and place an impracticable burden on the whole ... [settlement] process." *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 565–66, 63 S.Ct. 727, 749–50, 87 L.Ed. 959 (1943). *See also In re Penn Central Transp. Co.*, 596 F.2d 1102, 1114 (3rd Cir.1979) ("[T]he weighing of a claim against compensation cannot be an exact [determination]. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim.").

Rather, the job of the reviewing court is to determine whether "the value of the proposed compromise distribution is *reasonably* equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved." *In re New York, N.H. & H.R. Co.*, 632 F.2d at 955 (emphasis added). The test for reasonable equivalence is "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Id.* (*citing TMT*, 390 U.S. at 424–25, 88 S.Ct. at 1163–64; *In re Penn Central*, 596 F.2d at 1114; *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960); *In re California Associated Products Co.*, 183 F.2d 946, 949–50 (9th Cir.1950); *In re Equity Funding Corp.*, 416 F.Supp. 132, 145 (C.D.Cal. 1975)). A challenged settlement fails this test only if it "fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)).

In this case, the Trustee faced a small chance of a large recovery and a large chance of losing all the money in the estate and thus being unable to make a distribution to the general creditors. Judge Barliant valued the claims against the estate between $20–$50 million and the benefit to the estate from the settlement at approximately $40 million. Although the appellants might dispute the accuracy of these numbers, they are certainly within the range of litigation possibilities. Thus the district court did not abuse its discretion by approving of the settlement agreement.

## IV.

Last, the appellants challenge the district court's jurisdiction and authority to enter an injunction prohibiting all creditors and preference defendants from asserting claims against the Member–Owners which are the exclusive property of the estate. They also contend that even if the entry of the injunction was proper, the language of the injunction is overbroad. With respect to the jurisdictional issue, it is well established that a bankruptcy court has jurisdiction over all of the property of the debtor's estate, wherever located. 28 U.S.C. § 1334(b) (Supp.1986) (district court sitting in bankruptcy has jurisdiction over "all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"). The property of an estate includes all legal and equitable interests in property, 11 U.S.C. § 541(a), except as provided in 11 U.S.C. §§ 541(b) and (c)(2). Furthermore, it is well established that the bankruptcy court has the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) (Supp. IV 1986). Under this provision, the court has the authority to enjoin actions which threaten the integrity of the bankrupt's estate. *In re Davis*, 730 F.2d 176, 184 (2nd Cir.1984). The power of the court under this provision also includes the power to issue an injunction enjoining third parties from pursuing actions which are the exclusive property of the debtor estate and are dismissed pursuant to a settlement agreement. *See MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89 (2nd Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (affirming district court's order approving settlement between debtor and insurers and enjoining all future suits against insurers relating to settled policies); *In re All American of Ashburn, Inc.*, 805 F.2d 1515, 1517 (11th Cir.1986) (affirming permanent injunction issued pursuant to a "settlement

agreement [which] provided as a condition precedent to its effectiveness that the bankruptcy court enjoin any pending suit against [the other party to the settlement] to the extent that such suit asserted claims of [the debtor estate]").

Although we reject the appellants' contention that the lower court did not have jurisdiction or authority to issue the injunction, we do agree with their contention that the language of the injunction is overbroad. In relevant part, the language of the injunction provides:

All creditors of Energy Cooperative, Inc. ("ECI"), all contingent creditors of ECI, all persons who have filed claims against ECI, and all persons who have been sued by ECI or the Trustee for ECI to recover alleged preferences or fraudulent conveyances are enjoined from commencing or continuing any action or proceeding against ... [the Member–Owners] based in whole or in part on any of the following allegations:

(a) that any of the member-Owners breached any contracts with ECI;

(b) that any of the Member–Owners breached any duties to ECI;

(c) that any of the Member–Owners was the alter-ego of ECI, or that ECI was the alter ego or the instrumentality of any of the Member–Owners;

(d) that ECI made fraudulent conveyances or preferential transfers to any of the Member–Owners; or

(e) that any Member–Owner is liable for debts of ECI.

The appellants contend that this language can be construed to bar not only the causes of action against the Member–Owners which are the exclusive property of the ECI estate, but also all other claims which can be asserted against the Member–Owners in connection with their dealings with ECI. For example, an ECI creditor would be barred from pursuing a fraud claim based upon an allegation that the Member–Owners had induced the creditor to deal with ECI by representing that they had certain contractual obligations to ECI which required them to infuse capital into ECI. The above claim would be based in part on an allegation that the Member–Owners had "breached a contract with ECI" and thus prohibited by the injunction.

The district court clearly intended to limit the scope of the injunction to enjoin only those causes of action which belonged exclusively to the estate. In its opinion, the court stated that the injunction applied only to "causes of action which belong to the estate and which are part of the Trustee's settlement with the Banks and Member–Owners. No broader interpretation can or should be given to any injunction order entered as part of the settlement." The court apparently believed that its prefatory paragraph to the injunction, in which it stated that it entered the injunction "based on its findings that the claims asserted by the Trustee in the above-captioned action are the exclusive property of the ECI Estate," adequately delineated the scope of the injunction. Language delimiting the scope of the injunction, however, should be explicit and unambiguous. *See* Fed.R.Civ.P. 65(d). In order to prevent any confusion in the future, the order should state that only those claims which are the exclusive property of the ECI estate *and* are based in whole or in part on allegations (a)–(e) (see above) are enjoined. We therefore remand the injunction to the district court with instructions to modify the language of the injunction in accordance with this opinion. *See Diapulse Corp. of America v. Carba, Ltd.,* 626 F.2d 1108 (2nd Cir.1980).

V.

The district court's order approving the Settlement Agreement between the Trustee, the Member–Owners and the Banks is hereby affirmed. The injunction is remanded to the district court for action consistent with this opinion.