In re IONOSPHERE CLUBS, INC., Eastern Air Lines, Inc., and Bar Harbor Airways, Inc., d/b/a Eastern Express, Debtors.

The AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, and the International Association of Machinists and Aerospace Workers, Appellants,

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Indenture Trustee, and Mary Grace Shore, Representative of the Eastern Air Lines, Inc. Non-contract Employees, as Assignees of the Estate of Eastern Air Lines, Inc. and Martin R. Shugrue, Jr., as Trustee of the Estate of Eastern Air Lines, Inc., Appellees.

Frank SOBCHACK, Frank Kenneth Sobchack, Rhett G. Cooper, Jr. and Annie Cooper, Objectors–Appellants,

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO and Mary Grace Shore, as Assignees of the Eastern Estate, and Martin R. Shugrue, Jr., as Chapter 11 Trustee of the Eastern Estate, Movants–Appellees.

The OFFICIAL COMMITTEE OF PREFERRED SHAREHOLDERS OF EASTERN AIR LINES, INC., Objector–Appellant,

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO and Mary Grace Shore, as Assignees of the Eastern Estate, and Martin R. Shugrue, Jr., as Chapter 11 Trustee of the Eastern Estate, Movants–Appellees.

Nos. 92 Civ. 8364 (RWS), 92 Civ. 8365 (RWS), 92 Civ. 8524 (RWS) and 92 Civ. 8525 (RWS).

United States District Court, S.D. New York.

July 23, 1993.

Dickstein, Shapiro & Morin, Washington, DC (David I. Shapiro, R. Bruce Holcomb, of counsel), for intervenor David I. Shapiro.

O'Melveny & Myers (Adam C. Harris, Sheryl O. Silver, of counsel), King & Spalding (Daniel J. King, Paul K. Ferdinands, of counsel), New York City, for appellees.

Berlack, Israels & Liberman, New York City (Martin S. Siegel, Robert K. Gross, of counsel), for appellant Official Committee of Preferred Shareholders of Eastern Air Lines, Inc.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Janice Mac Avoy, Edward M. Ross, of counsel), for appellants Air Line Pilots Ass'n, Intern. and Intern. Ass'n of Machinists and Aerospace Workers.

Abbey & Ellis, New York City (Ralph L. Ellis, Jill S. Abrams, of counsel), for objector-appellants.

OPINION

SWEET, District Judge.

These motions concern appeals from certain orders entered in the bankruptcy proceedings of Eastern Airlines, Inc. ("Eastern").

Appellants the Air Line Pilots Association, International ("ALPA") and the International Association of Machinists and Aerospace Workers, AFL–CIO (the "IAM"), creditors of the bankruptcy estate of Eastern, have jointly appealed an order (the "Settlement Order" or the "Order") of the United States Bankruptcy Court of the Southern District of New York signed by the Honorable Burton R. Lifland, United States Bankruptcy Chief Judge during the settlement hearing (the "Settlement Hearing") held October 1, 1992, and filed October 2 authorizing and approving a Settlement Agreement as amended (the "Settlement Agreement") dated as of July 2, 1992, between Eastern and, *inter alia*, Continental Airlines, Inc. ("Continental"). ALPA also appeals a second order by Judge Lifland granted during the settlement hearing, denying ALPA's renewed motion to vacate certain protective orders (the "Denial").

The Official Committee of Preferred Shareholders of Eastern (the "Preferred Committee") and four individual preferred shareholders of Eastern, Frank Sobchack, Frank Kenneth Sobchak, Rhett G. Cooper, Jr. and Annie Cooper (the "Individual Preferred Shareholders") have both separately appealed the finding of the Bankruptcy Court included in the Settlement Order to the effect that certain claims asserted by the Preferred Stockholders derive from and belong to the Eastern Estate in bankruptcy, and therefore can only be asserted or settled by the Trustee. The Settlement Agreement as approved by the Order extinguishes and settles those claims and permanently enjoins Eastern's shareholders from pursuing any such claims in the future. Both the Individual Preferred Shareholders and the Preferred Shareholders Committee seek a *de novo* review of the legal conclusion in the Settlement Order that these claims are derivative and therefore within the jurisdiction of the Bankruptcy Court.

The appeals were heard on March 17, 1993. By letter dated June 4, 1993, the Dow Jones Company ("Dow Jones") requested leave to intervene to add additional arguments to ALPA's motion to unseal the Examiner's record, and the motion was considered fully submitted at that time.

For the reasons given below, the Settlement Order and the Denial are affirmed. The motion to reverse the finding by the Bankruptcy Court that the claims identified by the Preferred Committee and the Individual Preferred Shareholders are not derivative claims is denied as well.

***The Parties***

In 1981, Frank Lorenzo ("Lorenzo"), at that time chairman of Texas Air Corporation ("Texas Air"), purchased Continental Airlines, a Delaware corporation currently with its principal place of business in Houston, Texas. In 1986, Texas Air purchased and has owned at all relevant times all of the outstanding common stock of Eastern, also a Delaware corporation with its principal place of business in Miami Beach, Flori-

da. Texas Air is now Continental Holdings Inc. ("Continental Holdings").

ALPA and IAM, (collectively, "the Union Appellants") are unincorporated labor organizations or other legal entities and the authorized collective bargaining representatives for certain unionized employees of Eastern.

Texas Air Corporation ("Texas Air"), its successor Continental Holdings, System One Holdings, Inc., System One Travel Resources Inc., System One Direct Access, Inc., Texas Air Fuel Management, Inc., and Continental itself, together with other affiliates and subsidiaries, are parties to the Settlement Agreement with Eastern (collectively, the "Continental Debtors"). Jet Capital Corp., and its successor in interest S.M.A. Holdings Corp. ("S.M.A. Holdings") are also parties to the bankruptcy proceeding.

Lorenzo, Philip J. Bakes, Jr., Mickey P. Foret, Carl R. Pohlad, Robert D. Snedeker, and James W. Wilson are all individual signatories to the same Settlement Agreement (collectively, the "Individual Signatories"). In their capacities as directors and officers of Texas Air, Jet Capital and affiliates they are covered by two separate directors and officer liability policies from Corporate Officer and Directors Assurance Ltd. and ACE Insurance Company (collectively, the "Insurers"), worth $10 million apiece.

American National Bank and Trust Company of Chicago ("American National") is the Indenture Trustee for Eastern's claims, and Mary Grace Shore is the representative of the Eastern's non-contract employees (collectively, "the Assignees"). Martin R. Shugrue, Jr. ("Shugrue"), Chapter 11 Trustee of the Eastern estate, joins their opposition to the motion of ALPA and IAM to vacate the Settlement (collectively, the "Appellees").

David I. Shapiro was appointed by the Bankruptcy Court as the Examiner (the "Examiner") to investigate certain prepetition transactions between Eastern and Continental.

The Preferred Committee was appointed by the U.S. Trustee on June 16, 1989, to represent the holders of Eastern's five issues of preferred stock, four of which are publicly traded and a fifth of which is held by various trustees for the benefit of certain Eastern employees and by certain pilots. The Individual Preferred Shareholders are four of the six preferred shareholders of Eastern stock who are members of the Preferred Committee. The Preferred Committee, the Preferred Shareholders, and the Union Appellants (collectively, "the Appellants") allege essentially the same facts but focus upon different aspects of the Settlement Agreement.

***Prior Proceedings***

Eastern and its affiliate Ionosphere Clubs, Inc. ("Ionosphere") each filed a voluntary petition for relief under Chapter 11, Title 11 of the Bankruptcy Code (the "Code") on March 9, 1989, in the United States Bankruptcy Court for the Southern District of New York. At the time, Eastern was involved in a labor dispute with various striking unions, including ALPA and IAM. Shortly after the petition was filed, on March 14, 1989, Chief Judge Lifland denied without prejudice the motion of ALPA and IAM pursuant to 11 U.S.C. § 1104(a) to appoint a trustee to replace Eastern's management. However, Chief Judge Lifland determined that an examiner [1] should be appointed to investigate and review a series of allegedly fraudulent pre-Chapter 11 transactions involving Eastern, Continental, and Texas Air, and to reconsider whether a trustee should be appointed to manage Eastern's affairs. By order dated March 30, 1989, he allowed for the appointment of an examiner, and on April 5, 1989, the United States Trustee appoint-

1. Section 1104 of the Bankruptcy Code, 11 U.S.C. § 1104, provides for an examiner in Chapter 11 cases where a trustee is not appointed "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor." Accordingly, the order appointing Shugrue as trustee made the Examiner the "Special Advisor" to the estate.

ed Shapiro as Examiner for the Eastern Estate.

The Examiner investigated a series of business transactions between Continental and Eastern, which the Appellants alleged were deliberately masterminded by Lorenzo in order to secure the strategic value of Eastern's assets for Continental and Texas Air (the "Intercorporate Transactions"), apparently because Continental, as a non-unionized airline, was more profitable for Lorenzo than Eastern. Appellants charge that Lorenzo systematically transferred a wide variety of assets from Eastern to Continental including marketing and route structure assets as well as entire aircraft to enhance Texas Air's and Continental's profitability, and that Lorenzo's downsizing of Eastern under such circumstances amounted to intercorporate piracy.

As sister airlines, Eastern and Continental also engaged in hundreds of ordinary transactions, such as the transfer and sales of aircraft parts, leasing of spare engines and aircraft, and transactions arising out of a joint venture, the OnePass frequent flier program (the "Ordinary Course Transactions"). These transactions, and the obligations they entailed, continued after Eastern filed for protection from its creditors.

The Examiner decided, with the endorsement of the Bankruptcy Court, to have all interested parties (including the Eastern Estate, ALPA and IAM) consent to the entry of three protective orders in order to speed the production of documents and witnesses during the examination. On April 11 and on May 1, 1989, Eastern, Continental, and Texas Air, *inter alia,* stipulated to confidentiality of examinations of witnesses by the Examiner. The reason given for the stipulations was to facilitate examinations in light of "exigencies of time and the pending circumstances relating to Eastern and the current labor strikes affecting Eastern's operations," according to the stipulation signed May 1. On May 3, the stipulation was converted by the Bankruptcy Court into an order sealing the examinations pursuant to the terms of the stipulation. The May 3 Order, which referred to examinations of "confidential and commercial information," was entered pursuant to Bankruptcy Rule 9018, which allows a bankruptcy court to enter such an order with or without notice to all parties in regards to, among other matters, commercial or confidential research or information.

The final protective order was signed by the parties in mid-July 1989 and approved by the Bankruptcy Court on October 10, 1989 (collectively with the May 3 Order, the "Protective Orders"), and provided that

> [d]ocuments produced to the Examiner by Eastern or the T[exas Air] entities and the information derived therefore shall be kept confidential by the undersigned parties and may be used only in these reorganization cases.... Upon the completion of these reorganization cases and any proceeding authorized by the bankruptcy court or a plan or reorganization, copies of all documents shall be destroyed or returned to the party producing the documents.

The stipulation was necessary because Eastern, Continental, and Texas Air informed the Examiner that they would not voluntarily produce documents or witnesses unless the information obtained would be kept confidential and used only in the bankruptcy proceeding and that the Examiner's investigation would have been seriously delayed had the Bankruptcy Court not approved the assurance of confidentiality.

The Examiner's investigation was conducted pursuant to Bankruptcy Rule 2004 and took over ten months. Over 100 witnesses were examined, over 300,000 pages of documents were produced by Eastern, Continental, and Texas Air, and over 25,000 pages of documents were obtained from eighteen third parties. All materials were made available to all parties to the proceeding under the Protective Orders.

The Examiner filed his two volume report (the "Report") and an accompanying Analysis of Pre-Petition Transactions and Relationships on March 1, 1990. However, pursuant to the Protective Orders all materials collected and created in the course of the Examiner's investigation, and used by the Examiner in creating the Report, were

not filed. Instead, the Examiner compiled these materials into a five-volume Record (the "Record"). The Examiner presented the Report, but not the Record, to Chief Judge Lifland and the Report was made available to the public together with a brief summary of its contents for distribution to the press.

In March, 1990, immediately after the Examiner's Report was filed, ALPA moved to vacate the protective orders and release the Record. ALPA's motion was supported by IAM and the New York Times Company, the Washington Post, the Miami Herald, and the Dow Jones, which filed an *amicus* brief dated April 2 on behalf of its publication Wall Street Journal. After hearing oral argument on April 3, 1990, the Court reserved its decision (April 3, 1990 Hearing, Tr. at 71).

The Report found that out of the fifteen Intercorporate Transactions alleged to give rise to a cause of action against Continental, twelve alleged facts sufficient to support the assertion of claims against, among others, Texas Air and Continental based upon theories of fraudulent conveyance, breach of fiduciary duty, or constructive fraud on creditors. The fifteen transactions were: Texas Air's acquisition of Eastern; Eastern's $16 million receivable from Texas Air; Management fees paid by Eastern to Texas Air; Continental–Eastern Sales, Inc.; aircraft transactions between Eastern and Continental Airlines; People's Express notes purchased by Eastern from Texas Air; the sale of Newark gate leases from Eastern to Continental Airlines; the transfer of international route authorities from Eastern to Continental Airlines; the Texas Air fuel management arrangement with Eastern; Eastern's sale of System One to Texas Air; Bar Harbor Airways transactions; strike contingency fees paid by Eastern to Continental Airlines; Eastern's deposit of cash collateral for Texas Air's guarantee in connection with a $200 million private placement; Eastern's $40 million loan to Continental; and Eastern's payment of a cash dividend on the preferred stock guaranteed by Texas Air. The Examiner noted a cash value for potential claims based on each of the Intercorporate Transactions (the values ranged from $1.4 million assigned to claims arising out of Continental–Eastern Sales, Inc. up to Eastern's sale of SystemOne to Texas Air, which gave rise to claims valued at $150 to $250 million), and attached individual summaries for each transaction to the Report explaining how he arrived at that sum. The Examiner found that three of the Intercorporate Transactions—the transfer of the international route authorities, the strike contingency fees, and the $40 million loan from Eastern to Continental—did not give rise to any claims; however, apparently all fifteen were reinvestigated by the Assignees pursuant to their independent investigation which resulted in a new valuation by them of $1.2 billion.

The Report did not draw conclusions as to whether any of the questioned transactions were made with actual intent to defraud creditors, or whether any conduct was criminal. *In re Grand Jury Subpoena Duces Tecum Dated April 19, 1991,* 945 F.2d 1221, 1223 (2d Cir.1991). Eastern's claims were valued by the Examiner in the range of approximately $285 to $403 million, but the Examiner also found that Continental and its affiliates had defenses to liability which would make the outcome of any litigation uncertain:

> Like any litigation, however, such claims could fail in whole or in part. *Inter alia,* the constructive fraud theory depends upon proof of the debatable proposition that Eastern's capital was unreasonably small at the pertinent times. Because the law applicable to both constructive fraud and breach of fiduciary duty remains relatively unformed, any suit seeking to set aside Eastern's pre-petition transactions would be ploughing new legal ground.

Examiner's Report at 98.

***The Settlement Agreement***

In April, 1990, the Bankruptcy Court granted a motion by the Official Committee of Unsecured Creditors (the "Creditors' Committee") to appoint a trustee pursuant to Section 1104(a) for the Eastern estate, at least partly so that the Trustee could ade-

quately prosecute the causes of action identified by the Examiner.[2] The Examiner on his part recommended that the parties settle. He advised that Continental should take a benchmark settlement for $280 million in real value, $100 million of which should be in cash. The Examiner reported that he had reached a tentative settlement among certain parties before filing the Report, but this was personally vetoed by Lorenzo (Report at 53). Despite this and other proposals, no settlement agreement was reached, and matters were complicated still further when Continental and certain of its affiliates filed for protection under Chapter 11 on December 3, 1990, in bankruptcy court in Delaware.

On January 8, 1991, the Bankruptcy Court granted the application of Shugrue to assign the claims of the Eastern Estate to American National (as Indenture Trustee), Shore, and the Preferred Committee (the "Assignment Order"). The Assignees and their counsel undertook an independent investigation and evaluation of the claims. The Assignees identified 63 claims for relief, which they valued at $929 million plus interest for a total of $1.2 billion. A draft complaint was prepared with an adamnum clause which aggregated to approximately that amount, and attached as an exhibit to a proof of claim filed in the Continental bankruptcy proceedings in Delaware.[3]

The Assignees and the Eastern Trustee negotiated for over a year. On March 6, 1992, alleging that they were not being included in the negotiations, the Preferred Committee withdrew as assignees. The Indenture Trustee and Shore continued to negotiate, and drew up the Settlement Agreement dated July 2, 1992 with the Continental Debtors and Individual Signatories. The Settlement Agreement released Eastern from the claims of Continental based on the Ordinary Course transactions, claims alleged by Continental to be for more than $850 million. Of these, Continental has estimated at least $373 million (after set-offs) are post-petition or secured claims which Continental intended to assert as administrative expenses or secured claims against the Eastern Estate. The Settlement Agreement settled these Ordinary Course transactions for a payment of $9.1 million in cash and $300,000 in aircraft parts from Eastern to Continental. The Agreement settled the Intercorporate Transactions for $200 million in allowed prepetition general unsecured claims and $12 million in cash, which after Eastern's payment to Continental for the Ordinary Course transactions nets for the Eastern estate a $2.9 million cash payment by Continental and an indeterminate claim. The Agreement settled Eastern's claims against the Individual Signatories for $8 million in cash paid by the Individual Signatories' Insurers in exchange for releases from all personal liability from the Intercorporate Transactions.

Following the execution of the Settlement Agreement, the Assignees and the Trustee filed a joint application with the Bankruptcy Court on July 9, 1992, for approval of the settlement (the "Joint Application").

***Subsequent Motions to Unseal the Record***

On August 28, 1991, ALPA renewed its motion to have all the investigative materials introduced into evidence en masse. The court denied the motion at that time.

When the Assignees filed to obtain court approval of the Settlement Agreement, ALPA renewed its motion to unseal the Examiner's record and to vacate or modify the Protective Orders during the Settlement Hearing on October 1, 1992. That

2. However, because the new trustee, Martin Shugrue, had been an officer and executive of Continental from 1988–1989, he delegated this task to two Eastern executives, Robert Gould and John Scilian.

3. ALPA alleges that this complaint was filed as part of the adversary proceedings in the Eastern bankruptcy action, but Zweibel testified before Judge Lifland at the Settlement Hearing held October 1, 1992, that to his knowledge the Assignees had never filed the complaint: "It was not filed against any party naming that party as a Defendant. It was, as I recall, filed in connection with our Proof of Claim in the Continental cases or a variation was filed in connection with that Proof of Claim to set forth the general basis of our claims," Settlement Hearing Tr. at 120.

motion was considered three times during the course of the hearing. On the first occasion, the attorney for ALPA moved to have the entire record admitted, which was objected to by the attorney for the Creditors' Committee. The Court sustained the objection under Rule 403 of the Federal Rules of Evidence,[4] commenting that "[i]f ever this was a Rule 403 sustenance of an objection, this is it," (Settlement Hearing Tr. at 105). ALPA again moved to "incorporate simply those portions of the Examiner's records that are referred to in his report," which the Court again denied. The Court raised the issue *sua sponte* again at the end of the hearing, noted the decision of the Court of Appeals in *In re Grand Jury Subpoena Duces Tecum,* and held that the protective orders should remain in effect. (Settlement Hearing Tr. at 222).

***The Shareholders' Claims***

The Individual Preferred Shareholders and the Preferred Committee (collectively, the "Preferred Shareholders") assisted the Examiner in his investigation of the Intercorporate Transactions and served until March 6, 1992, as a representatives to prosecute these causes of action on behalf of the Eastern Estate pursuant to the Bankruptcy Court's Assignment Order of January 8, 1991, under 11 U.S.C. § 105(a). The text of the Assignment Order stated:

> [T]he claims, all rights and benefits accruing to the Trustee or the estate pursuant to title 11, United States Code, and any other pre-petition causes of action on behalf of Eastern's estate against Continental Airlines Holdings, Inc ... are hereby assigned to ... American National Bank and Trust Co. of Chicago, Indenture Trustee, and Many Grace Shore as representative of Eastern's non-contract employees, and to the Committee of Preferred Stockholders ... for prosecution on behalf of the Eastern estate ...

After the Preferred Committee withdrew as assignee, counsel for the Preferred Shareholders notified counsel for Eastern and Continental that the Preferred Shareholders intended to bring independent claims which were not part of the Eastern estate against the officers and directors of Continental.

On June 4, 1992, the Bankruptcy Court granted Continental's motion to enjoin the Preferred Shareholders from instituting litigation against the Individual Signatories and any other officers and directors of Continental Holdings pending hearings on any Settlement Agreement. The Preferred Stockholders have alleged that the Injunction has prevented them at all times from filing a complaint, but they did file a Memorandum of Law in Opposition to Continental's preliminary injunction motion (the "Preferred Shareholders' Memorandum") setting forth claims based on tortious interference with contract and breach of fiduciary duty against the Individual Signatories. After the Settlement Agreement was reached on July 2, 1992, the Trustee and the Assignees filed a motion on July 9, as part of the Joint Application, seeking to permanently enjoin the Preferred Shareholders from asserting the causes of action they identify in their Memorandum.

The Settlement Order authorizing and approving the Settlement Agreement extinguishes and releases all claims set out by the Preferred Shareholders in their Memorandum:

> [T]he causes of action which ... would be asserted by the [Preferred Shareholders], as set forth in the [Preferred Shareholders' Memorandum] and the preferred shareholders' Objections, are causes of action which are property of the Eastern estate and which only the Eastern estate has standing to pursue.

¶ 19 of the Settlement Order dated October 1, 1992. The Order goes on to note that "[t]he Settlement Agreement extinguishes these causes of action in that they are property of the Eastern Estate arising out of or relating to the Intercorporate Trans-

4. Rule 403 provides that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

actions," *id.* The Settlement Agreement itself states:

> ¶ 13. *Extinguishment of Claims.* Any claim against any Individual Signatory or any Corporate Defendant which is predicated upon damages to Eastern or the Eastern Estate that ... arises from or relates to (a) the Intercorporate Transactions (including without limitations the Preferred Derivative Claims) [i.e., the claims set out by the Preferred Shareholders in their Memorandum]; or (b) any other claim released by the Eastern Estate pursuant to [this Settlement Agreement] shall be extinguished irrespective of the person or entity asserting the claim of the form or forum in which the claim is asserted.

In this manner, Bankruptcy Court permanently enjoined the Preferred Shareholders from commencing, pursuing, or prosecuting any act, action or claim which was the property of the Eastern estate and which was settled and extinguished pursuant to the Settlement Agreement.

The Preferred Shareholders have appealed only that portion of the Settlement Order which states that their claims as set out in their Memorandum are derivative claims which belong to the Eastern Estate.

***Discussion***

***The Bankruptcy Court's Approval of the Settlement Should Be Confirmed***

A bankruptcy court may approve a settlement where it is supported by adequate consideration, is "fair and equitable," and is in the best interests of the estate. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re Texaco, Inc.,* 84 B.R. 893, 901 (S.D.N.Y.), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988).

> [T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range.

*Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.) *cert. denied sub nom. Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) (Friendly, J.) (construing *TMT Trailer Ferry* in context of settlement of derivative suit). The "reasonable range" of litigation possibilities, *In re New York, N.H. & H.R. Co.,* 632 F.2d 955, 960 (2d Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980) (citations omitted) includes the possibility of unfavorable outcomes:

> In undertaking an examination of the settlement, we emphasize that this responsibility of the bankruptcy judge, and ours upon review, is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement "fall[s] below the lowest point in the range of reasonableness,"

*In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983), quoting *Newman,* 464 F.2d at 693; *accord, In re Texaco,* 84 B.R. at 901.

Although compromises of claims are a necessary and usual part of the bankruptcy process, "[a]t the same time, however, it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court," *TMT Trailer Ferry,* 390 U.S. at 424, 88 S.Ct. at 1163, quoting *National Surety Co. v. Coriell,* 289 U.S. 426, 436, 53 S.Ct. 678, 681, 77 L.Ed. 1300 (1933). A bankruptcy judge may not simply accept a trustee's word that the settlement is reasonable, nor may he merely "rubber stamp" a trustee's proposal. *In re Energy Cooperative, Inc.,* 886 F.2d 921, 924 (7th Cir.1989). Instead, he must reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and "form an educated estimate of the complexity, expense, and likely duration of such litigation ... and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry,* 390 U.S. at 424, 88 S.Ct. at 1163; *accord, Newman,* 464 F.2d at 691. The standard for review is whether the Bankruptcy Judge abused his discretion in ap-

proving the settlement. *Energy Cooperative,* 886 F.2d at 926.

The record in this case supports the reasoned decision of Chief Judge Lifland to approve the settlement, for it indicates that the Bankruptcy Court took into account and weighed the factors necessary for the determination of the appropriateness of the settlement. These factors which should be considered by a court in approving a settlement agreement in the context of a bankruptcy case include the complexity of the litigation, comparison of the proposed settlement with the likely result of litigation, the scope of the discovery preceding settlement, and the ability of the defendant to satisfy a greater judgment. *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974); *In re Texaco,* 84 B.R. at 902.

In light of these factors, the Union Appellants have focused on two issues which they state must be considered: whether the Settlement Agreement represents a value so low that mere disparity in numbers means it cannot come within the lowest rung of reasonableness, and whether the Bankruptcy Court adequately took into account both the Individual Signatories' ability to pay and Continental's bankruptcy.

### *Litigation Risks and the Total Value of the Settlement*

A difference in value between what the claims are estimated to be worth and the Settlement Amount in itself does not invalidate the settlement. Admittedly, Eastern's recovery in real value is a far cry from $1.2 billion arrived at by the Assignees in their independent investigation of claims arising from the Intercorporate Transaction. The administrative expenses alone are estimated at $15 million from the two separate investigations of the claims. The court's approval of the settlement, however, is reasonable in light of the facts of the case, not the extent of the disparity between the settlement and the potential recovery:

> Appellants contend that a settlement for only one-seventh of [the amount alleged] is so small as to fall below the lowest point in the range of reasonableness. Although at first blush the argument is not unpersuasive, we reject it on the facts of this case.

*Newman,* 464 F.2d at 693.

Therefore, the essence of the test is reasonableness under the circumstances: a "reviewing court must determine that the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved," *In re New York, N.H. & H.R. Co.,* 632 F.2d at 960. This does not mean the value of the compromise must be dollar-for-dollar the equivalent of the claim. In *In re Energy Cooperative, Inc.,* 886 F.2d 921 (7th Cir.1989), the court approved the settlement:

> The world of settlements, however, does not read like a balance sheet—nor should it. Assigning value to contested claims cannot be done with ... precision.... [T]he job of the reviewing court is to determine whether "the value of the proposed compromise distribution is *reasonably* equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieve," *In re New York, N.H. & H.R. Co.,* 632 F.2d at 955 (emphasis added.) The test for reasonable equivalence is "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Id.* (*citing TMT,* 390 U.S. at 424–25, 88 S.Ct. at 1163....)

*Energy Cooperative,* 886 F.2d at 928–29.

> In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery. Any reading of Judge Friendly's opinion in *Newman v. Stein* [which set out the "range of reasonableness" standard] ... which seems inconsistent with this principle misreads [that] opinion.

*Grinnell Corp.*, 495 F.2d at 455 n. 2. The "reasonableness" of the settlement depends upon all factors, including probability of success, the length and cost of the litigation, and the extent to which the settlement is truly the product of "arms-length" bargaining, and not of fraud or collusion. *In re Drexel*, 960 F.2d at 292; *In re Texaco*, 84 B.R. at 902.

In the case at bar, the Trustee and the Assignees have submitted more than ample evidence that Chief Judge Lifland took into account all factors in the settlement. The Bankruptcy Court received offers of proof and the testimony of three witnesses as to the potential costs and delay of the litigation. The Trustee's and Assignee's principal witness was Joel B. Zweibel, counsel to the Assignees ("Zweibel"), who had the primary responsibility for negotiating the Settlement Agreement.

Zweibel argued that considerable delays in the litigation were inevitable, for the Continental Debtors and the Individual Signatories made it clear they would first oppose the actions by asserting defenses based on issues of procedure. As for the merits, Zweibel testified before Chief Judge Lifland that it would be difficult for Eastern to prove constructive fraud or fraudulent conveyance for a number of reasons. Eastern would have to prove that the Continental Debtors had entered into the intercorporate transactions with actual intent to hinder, delay, or defraud their creditors, an endeavor made more difficult by the fact that Eastern would have to recover damages from Continental affiliates, including Continental Holdings, which had not been parties to the Intercorporate Transactions. Claims based on fraudulent conveyance would be difficult to prove for the same reasons and for the additional reason that the Examiner concluded in his Report that Eastern was not insolvent when many of the transfers occurred.

With respect to S.M.A. Holdings and the Individual Signatories, Zweibel testified that the prospect of reducing the claims against them to judgment was "speculative at best and perhaps dubious," (Settlement Hearing Tr. at 115). To be successful in such litigation, Eastern would have to first litigate the merits of each of the Intercorporate Transactions, and then persuade the trier of fact that the damages to the Eastern estate, if any, resulting from the Intercorporate Transactions would be recoverable from the Individual Signatories pursuant to Section 550 of the Bankruptcy Code [5] (Settlement Hearing Tr. at 42–44). Zweibel also identified an array of legal issues which the Individual Signatories would use against claims for breach of fiduciary duty, including how to assert claims against officers and directors of both a parent and a wholly-owned subsidiary against the parent in favor of the subsidiary and whether the interested transactions were "cleansed" pursuant to Section 144(a) of the Delaware General Corporation Law by approval of a majority of the independent directors, and whether they owed a fiduciary duty as directors of a parent corporation to the subsidiary corporation. Finally, Eastern would have to rely upon the benefit which the Individual Signatories derived from the increase in the value of their equity holdings in Texas Air as a result of the transfer, something which could be difficult to prove under the circumstances.

Zweibel testified to the expense and the scope as well as to the uncertainty of the potential litigation. Zweibel estimated at the Settlement Hearing that the expense would run at an average of some $300,000 a month and take perhaps five years. The scope of the possible discovery, for example, was enormous. The Trustee and the Assignees averred that since witnesses questioned by the Examiner had been questioned informally pursuant to Bankruptcy Rule 2004 during the course of settlement negotiations, the potential defendants would insist that all would have to be formally redeposed.

5. "[T]he trustee may recover, for the benefit of the estate, the property transferred, from ... (a)(1) the initial transferee or such transfer or the entity for whose benefit the transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550.

In contrast to the Union Appellants, the potential defendants, especially the Individual Signatories, could afford to wait: their legal fees would not only be paid by the insurers but such payments would reduce the corpus of their two director and officer policies (which had a total limit at $20 million) dollar for dollar. Because the witnesses estimated the potential cost of such litigation up to $15 million, this expense was a factor which Chief Judge Lifland properly took into consideration. In response to this evidence, Chief Judge Lifland stated that "what has been developed so far at great cost and expense of time is a blueprint for litigation, very complex litigation, and building on that blueprint is an enormous, lengthy and expensive task" (Settlement Hearing Tr. at 154).

***Ability to Pay as a Factor of Settlement***

The Union Appellants assert that the approval of the Settlement Agreement failed to take into account either Continental's bankruptcy or the Individual Signatories' ability to pay a higher judgment. However, these claims still fail to demonstrate an abuse of discretion on the part of Chief Judge Lifland.

Despite the Union Appellants' contention that knowledge of Continental's bankruptcy put the Assignees under a duty to focus on the real dollar that would be obtained for the estate, ALPA and IAM have cited no cases to the effect that settlement with a bankrupt requires a higher settlement price in order to achieve more in "real dollars." A cause of action has an inherent value based upon the facts, the law and the practical difficulties involved in bringing it to judgment (*Weinberger v. Kendrick*, 698 F.2d 61, 78–79 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Newman*, 464 F.2d at 693), a value which does not change upon every new turn of circumstances.

A defendant's ability to pay is a factor in evaluating a settlement. *Grinnell*, 495 F.2d at 467; *Newman*, 464 F.2d at 692. The most troubling of the *Drexel* factors in the context of this appeal is the ability of the Individual Signatories to pay, *see Drexel*, 960 F.2d at 292 (court approved settlement where Michael Milken paid $400 million in exchange for releases from creditor). However, the *Drexel* court did not approve the settlement in that case simply because Milken personally paid money, but because Drexel itself could not pay more:

> Finally, it is doubtful that Drexel could withstand greater exposure that already enumerated in the Settlement Agreement.... The Settlement Agreement is unquestionably an essential element of Drexel's ultimate reorganization. In turn, the injunction [against bringing any future actions against Drexel's directors and officers] is a key component of the Settlement Agreement.... This enables the directors and officer to settle these suits without fear that future suits will be filed. Without the injunction, the directors and officers would be less likely to settle. Thus, we hold that the district court did not abuse its discretion in approving the injunction.

*Drexel*, 960 F.2d at 293.

Here one fact in the record supports an inference that the settlors did take Continental's bankruptcy intc account. The Examiner's initial assessment of the worth of the claims in 1990 was from $285 to $403 million. After Continental's bankruptcy in December, 1991, the Assignees evaluated the claims at $1.2 billion based upon precisely the same evidence, since Zweibel's testimony before Chief Judge Lifland at the Settlement Hearing indicated that they felt "that all of the information regarding the claims was available either in the Examiner's report and in the underlying evidentiary foundation or had become available to us throughout the Eastern case in our capacity as counsel to the Creditors Committee," (Settlement Hearing Tr. at 88–89). Although ALPA alleges that "the Examiner's lower valuation can be reconciled in part because the Examiner's Report ... allowed for a discounted value in order to reflect, among other things, litigation risks," (Mem. of Law of ALPA at 11, n. 6), the record as it stands raises the inference that the Assignees' $1.2 billion valuation

took into account Continental's status as a bankrupt.

Testimony before Chief Judge Lifland and evidence contained in the proof of claims filed by the Trustee and the Assignees, however, demonstrated that the parties to the Settlement Agreement dropped into a negotiating range of $350 to $360 million almost immediately. Zweibel testified that the Assignees' general technique in negotiation was to not to go after each individual potential defendant, but to see if they could not get a sufficiently large total sum for Eastern out of any combination of sources from the defendants. Part of this strategy meant that the Assignees made no separate valuation of claims against the Individual Signatories, although Zweibel testified that they made "discrete inquiries" as to certain of the Individual Signatories' abilities to pay. However, there is no factual information present in the record on appeal to contradict the argument of the Trustee and the Assignees that, in view of the Individual Signatories' initial and complete denial of liability, their eventual offer to pay eight million was an accomplishment on the part of the Assignees, and that it was the participation of the Individual Signatories which allowed Eastern to achieve a global settlement of all the Intercorporate Transactions and Ordinary Course Transactions claims (Settlement Hearing Tr. at 43). *Cf. In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1324 (4th Cir. 1991); *Grinnell*, 495 F.2d at 455. Releases of non-debtor third parties have withstood challenges where they are essential to the successful administration of the estate. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir.1988), *cert. denied* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *Drexel*, 960 F.2d at 293. Given that considerable testimony heard by the Bankruptcy Court about the Individual Signatories' willingness to spend their insurance litigating their claims, $8 million may be low but it is not, under these circumstances, unreasonable.

The Bankruptcy Court also heard testimony on the risks to the Eastern Estate of litigating the mostly post-petition claims which Continental would assert which arose out of the Ordinary Course Transactions. Their post-petition status would enable Continental to assert them as administrative claims, a factor which might result in Eastern's incurring a cash-payment obligation considerably higher than the $9.1 million provided for in the Settlement Agreement. In response, the Union Appellants do not contest the settlement of the post-petition claims of Continental arising from the Ordinary Course Transactions; since the Settlement Agreement is a global settlement of all the claims, it is not possible to vacate only the portions which affect the Continental Debtors and the Individual Signatories' abilities to pay and not Eastern's. The appropriate inquiry is whether the Settlement Agreement in its entirety is appropriate for the Eastern estate.

Finally, Assignees' counsel characterized the Assignees' original $1.2 billion valuation of the claims filed in the Complaint as merely an "aggressive" negotiation position, and the Examiner himself did not arrive at so high a sum. Although the original complaint filed by the Trustee and the Assignees stated this amount as the damages claim, this is not inconsistent with an attempt to settle the litigation. *Cf. In re Teltronics Services, Inc.*, 46 B.R. 426, 429 (E.D.N.Y.1984), *aff'd* 762 F.2d 185 (2d Cir.1985). The Bankruptcy Court was presented with evidence that litigation would be time-consuming, expensive, and, although Eastern's claims were not in doubt, it would be difficult to actually secure a much larger recovery against the bankrupt Continental Debtors and also difficult to prove every element of every claim in order to collect against the individual Signatories. *Cf. Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir.1989) ("Had the court properly evaluated the bankruptcy trustee's chances of reaching the assets ... it surely would have evaluated those chances of success at nearly one hundred percent.... Even if there was some uncertainty as to whether the ... property could be reached, the Bank offered to pay all such costs; the bankruptcy estate would incur no expense

in pursuing the litigation"). The plaintiffs have claimed no bad faith on the part of the Trustee or the Assignees, but simply claim that, weary of protracted negotiations, the Trustee and Assignees took the best offer they could get without any further bargaining.

This does not make Chief Judge Lifland's approval of the Settlement Agreement an abuse of discretion. It should be noted here, as in *Drexel,* that the judge who presided over the Settlement Agreement has had substantial experience in presiding over complex bankruptcies in general and over this case in particular. Chief Judge Lifland was well aware both of the difficulties the Appellants will have in proving their claims and of Continental's financial straits, and his considered decision should not be disregarded lightly.

"[T]he weighing of a claim against compensation cannot be ... exact. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim," *In re Penn Central Transp. Co.,* 596 F.2d 1102, 1114 (3rd Cir.1979). Although the Trustee and the Assignees may have felt that the litigation ultimately would be successful, they still had discretion to settle the case. *In re Teltronics,* 46 B.R. at 428; *In re Ira Haupt & Co.,* 252 F.Supp. 339, 343 (S.D.N.Y.1966). The amount settled for is within the range estimated for the worth of the claims by the Examiner and by the Assignees; it is Continental's bankruptcy, and not the Settlement Agreement, which discounts the agreed-upon $200 million and prevents Eastern from recovering. Taking into account all the factors which the Bankruptcy Court should consider in deciding whether or not to consider the settlement reasonable, and considering the time and attention with which that Court reached its decision, Chief Judge Lifland did not abuse his discretion in approving of the settlement.

***The Public Right to Discovery Records***

Only ALPA, not IAM, appeals from Chief Judge Lifland's decision during the October 1, 1992 Settlement Hearing against unsealing the Examiner's record. ALPA argues that continuing the Protective Orders infringes statutory, common law and constitutional rights of the public to the documents which are an integral part of the court record. Although these documents have never been filed with the court, ALPA argues that these documents were relied upon by the Examiner in making his Report, and the Report has fundamentally affected the adjudicatory process. Dow Jones has also written an *amicus* letter dated June 4, 1993, to this Court on behalf of the Wall Street Journal requesting that the Record be made available to the public.[6] Dow Jones joins ALPA's legal arguments, adding that its journalists have a strong interest in reviewing the documents and reporting on their contents, for without them the public will have an inadequate understanding of the Examiner's report.

As a party to the stipulations which became the basis of the Protective Orders, ALPA cannot now object to the Protective Orders:

> The parties voluntarily entered into [the stipulations] in order to facilitate discovery.... Plaintiffs are now attempting to abrogate that agreement.... Plaintiffs cannot now attempt to undo what they have willingly wrought.

*Zenith Radio Corp. v. Matsushita Electric Indus. Co.,* 529 F.Supp. 866, 894 (E.D.Pa. 1981); *see also City of Hartford v. Chase,* 942 F.2d 130, 136 (2d Cir.1991); *In re Adobe Systems, Inc. Secur. Litig.,* 141 F.R.D. 155, 163–64 (N.D.Cal.1992). In denying ALPA's motion to unseal the record from the Bench, Chief Judge Lifland observed that no-one would bother to sign on to a confidentiality stipulation if it had no lasting effect. (April 3, 1990 Hearing Tr. at 56–57.)

6. The press has standing to intervene in actions to petition for access to bankruptcy proceedings and records, *see In re Apex Oil Co.,* 101 B.R. 92, 95 (E.D.Mo.1989), citing *In re Petition of Tribune Co.,* 784 F.2d 1518, 1521 (11th Cir.1986). Chief Judge Lifland permitted Dow Jones to intervene in the bankruptcy proceedings below.

 However, it is appropriate to deny ALPA's motion—and Dow Jones' as well—for another reason. The purpose of an examiner's investigation in bankruptcy is to discover whatever assets may exist for the estate of the bankrupt, just as one purpose for the appointment of a trustee is so that a trustee may use statutory powers conferred by the Bankruptcy Code to collect all property belonging to the debtor for the benefit of the debtor's creditors. The bankruptcy code gives a trustee more power than a solvent debtor to collect property belonging to the estate (*see, e.g.,* 11 U.S.C. §§ 542, 544). Bankruptcy Rule 2004 likewise gives the Examiner scope to investigate which is broader than that of civil discovery under Rule 26, *In re Apex Oil,* 101 B.R. at 101.

 The investigation of an examiner in bankruptcy, unlike civil discovery under Rule 26(c), is supposed to be a "fishing expedition," as exploratory and groping as appears proper to the Examiner, *In re Vantage Petroleum Corp.,* 34 B.R. 650, 651 (E.D.N.Y.1983), citing *Sachs v. Hadden,* 173 F.2d 929, 931 (2d Cir.1949). Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation. "Consequently, third parties have a greater interest in protecting their privacy than a litigant" engaged in discovery under Rule 26 (*In re Apex Oil,* 101 B.R. at 102), for the Examiner's investigation of their affairs need not be conducted with the types of protection envisioned by the Federal Rules of Civil Procedure.

> The prospect of an Examiner being required to indiscriminately produce investigative materials obtained through promises of confidentiality and reliance upon this Court's order raises grave concerns touching both the integrity of the Bankruptcy Court's processes, as well as the integrity of the statutory position of the Examiner.... [H]is findings do not have the binding effect on the Court or parties of those of a special master, arbitrator or magistrate....

*In the Matter of Baldwin United Corp.,* 46 B.R. 314, 316 (S.D.Ohio 1985).

 The Bankruptcy Court in *Baldwin* compared the function of an examiner to a "civil grand jury" investigating to ascertain legitimate areas of recovery and appropriate targets for recovery, *id.* at 317. Any record compiled by the Examiner is not a judicial record, but simply a source of information designed for the purpose of identifying the assets of the estate for the eventual benefit of the debtor and its creditors. That some of the parties to the proceedings will assert substantive rights to the assets, once collected, does not make the identification of these assets an adjudicatory determination of "substantive rights." Once the assets have been identified by the Examiner, it is the role of the Bankruptcy Court to determine—or, as in the case of the Settlement Agreement here, to approve—the distribution of these assets and the determination of the parties' rights to them in accordance with the priorities set out by the Bankruptcy Code.

> The primary function of an examiner is to investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case.... He is not an extension of the Court. The Examiner's mere review of documents in a F.R.B.P. 2004 examination does not "elevate" the documents to the status of judicial records.

*In re Apex Oil Co.,* 101 B.R. at 98–99.

 The former Examiner has submitted evidence before Judge Lifland and before this Court which demonstrates that his investigation was a nonadversarial "fishing expedition" governed by Bankruptcy Rule 2004. The Examiner himself testified before Chief Judge Lifland that "[w]hat I was doing was not discovery under the federal rules," that he had conducted certain examinations personally, without counsel, and that he had not put certain witnesses under oath.

 The stipulations among the parties demonstrate that in the case at bar the Examiner was compiling his Report as if it were a disclosure statement—not a determination of substantive rights, but a

source of information upon which creditors make an informed judgment about the merits of a plan of reorganization. The Protective Order dated October 10, 1989 by its terms precludes all parties to the Examiner's investigation from using any of the materials in the Examiner's Record, for it explicitly provides that the material provided by the parties for the examination

> shall be confidential and will not be used or referred to by any party ... in any way, manner or otherwise, except for the use of same by the Examiner for the purposes of his report(s), by the Committee solely in connection with this deliberation and subject to its confidentiality restrictions or by any of the parties in accordance with further order(s) of the Court.

This was in the interests of the parties at the time. While an Examiner may be appointed by the Court, he is appointed to assist parties other than the Court. *In re Apex,* 101 B.R. at 99. The Examiner's findings are no more binding on the court than those of any other attorney's, and until the documents he compiles are filed with the court or become judicial documents in some other way, no right of public access attaches to them under Section 107(a) of the Bankruptcy Code or any other law.[7]

> [T]he Underlying Documents are not subject to § 107(a) because they have not been, and will not be, filed. The plain language of § 107 establishes standards only for those documents *which are filed with the court.* To the extend the Underlying Documents are not filed, they are not subject to the § 107(a) requirements.

*In re Apex Oil Co.,* 101 B.R. 92 (E.D.Mo. 1989).

In the Second Circuit, documents which are part of the court record should not remain under seal absent the most compelling reasons, *Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983), but the problem here is precisely that the disputed material is not part of the court record. There is no common-law or constitutional right of access to discovery materials absent good cause. *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2207, 81 L.Ed.2d 17 (1984) ("restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.")[8] The information collected informally by the Examiner pursuant to a Bankruptcy Rule 2004 "fishing expedition" here does not even rise to the level of Rule 26 discovery materials considered by the Supreme Court. The cases cited by ALPA and Dow Jones pertaining to the necessity of open court records are simply inapposite. "If there is no absolute constitutional right to pretrial discovery gathered for the purpose of resolving substantive legal rights, then certainly there is no absolute constitutional right to discovery gathered solely for the purpose of educating the creditors," *In re Apex Oil,* 101 B.R. at 103.

### *The Martindell Standard*

The Court of Appeals for the Second Circuit has already examined the Protective Order of May 3, 1989 in the context of a government subpoena for the Examiner's Record, *see In re Grand Jury Subpoena Duces Tecum Dated April 19, 1991,* 945 F.2d 1221 (2d Cir.1991), and held that the government could not unseal the Examiner's Record unless it could show "compelling need or extraordinary circumstances" consistent with the standard enunciated in

7. Section 107(a) provides that papers filed with the Bankruptcy Court are public records unless the Court decides to protect the information pursuant to standards set forth in Section 107(b) which provides for the protection of commercial, confidential, or defamatory matter. 11 U.S.C. § 107. Here, however, the Court stated that it was protecting the information under the Code's standard for commercial and confidential information when it adopted the terms of the parties' own stipulations of confidentiality into the Protective Orders.

8. Although Rule 5(d), F.R.Civ.P., requires that all discovery materials must be filed with the district court unless the court orders otherwise, this requirement has been altered by local rule (Civ.R. 18(a)), in the Southern District of New York. *See In re "Agent Orange" Product Liability Litig.,* 821 F.2d 139, 146 (2d Cir.1987).

*Martindell v. International Telephone & Telegraph Corp.,* 594 F.2d 291 (2d Cir. 1979). The United States Attorney dropped his request for the documents after they were produced directly to him by Eastern and Continental.

ALPA and Dow Jones contend that the *Martindell* standards apply only when it is a government seeking to vacate a protective order and that, absent the awesome threat of state power, the standards of *Martindell* do not apply. This is not an entirely accurate reading of *Martindell,* which held that "absent a showing of improvidence in the grant of a ... protective order or some extraordinary circumstance or compelling need ... a witness should be entitled to rely upon the enforceability of a protective order against any third parties, *including* the government," *Martindell,* 594 F.2d at 296 (emphasis added). Third parties other than the government have had their requests to vacate protective orders denied because they have not met the *Martindell* standards. *See, e.g., Federal Deposit Insurance Corp. v. Ernst & Ernst,* 677 F.2d 230, 231 (2d Cir.1982) (nonprofit consumer organization request for terms of settlement denied under *Martindell*). Records sealed by a court should remain sealed if the Court finds a compelling reason for sealing them, even if the party asking to unseal is the press. *See United States v. Asbury Park Press, Inc.,* 996 F.2d 1404, 1408–09 (2d Cir.1993) (reaffirming *In re Grand Jury Subpoena* in context of upholding sealing of record of criminal proceedings in face of requests by press where circumstances justified sealing).

Although *In re Grand Jury* suggests that reliance by a third party is necessary, it also suggests that the mere fact the information was disclosed pursuant to a protective order suggests that reliance can be presumed: "[w]e see no reason on the record before not to presume, as we have in the past, that a witness relied on it," *In re Grand Jury Subpoena,* 945 F.2d at 1225. However, ALPA and Dow Jones argue that *Martindell* is inapplicable because any such assumption of reliance is not warranted here, since they argue the facts of this case more closely resemble those in *In re Agent Orange* than *Martindell.*

In *Agent Orange,* a Special Master supervising discovery issued a blanket protective order on all records produced or generated in the discovery by any party, 821 F.2d at 142. In his supporting memorandum of law, the Special Master noted that "as discovery progresses and fundamental disputes are resolved, it may become desirable to lift this order," *id.* Because of this and other facts of the case, "appellants were on notice virtually from the time [the order] was issued that the district court's order might be lifted or modified," and therefore they could not reasonably have relied on a continuing grant of confidentiality. *Agent Orange,* 821 F.2d at 144. In the case at bar, the Protective order of October 10, 1989 contemplated a very different fate for the documents in the Examiner's Record:

> Upon the completion of these reorganization cases and any proceeding authorized by the bankruptcy court of a plan of reorganization, copies of all documents shall be destroyed or returned to the party producing the documents.

Although this order also states that the confidentiality afforded the discovery materials could be "subsequently revoked, vacated or modified," this simple phrase does not mean (as ALPA argues it does) that all parties contemplated the unsealing of the Record and therefore cannot be said to have relied upon any guaranty of continuing confidentiality. It is undisputed that a district court retains the power to modify or lift protective orders that it has entered, *see Palmieri v. New York,* 779 F.2d 861, 864–65 (2d Cir.1985), and the Order merely recognizes this power. The Supreme Court in *Seattle Times,* 467 U.S. at 36, 104 S.Ct. at 2209, stated that trial courts have "broad discretion ... to decide when a protective order is appropriate and what degree of protection is required." The Court also stated that the trial court is in the best position to weight the need for protection and has "substantial latitude to fashion protective orders," *id.*

The Examiner, who had actually served as Special Master in the Agent Orange case, testified before Judge Lifland that the facts of discovery taken pursuant to the protective order in that case differed completely from his investigation in the case at bar. (April 3, 1990 Hearing Tr. at 68–69). The Examiner has also alleged that the parties who disclosed information to him during the course of his investigation relied upon the Protective Orders' promises of confidentiality. The record discloses that a representative of Trans-World Airlines, Inc. ("TWA") appeared before Judge Lifland at the April 3, 1990 hearing to testify that TWA had relied upon the protective order in providing documents and requested that the information be kept sealed, and the Examiner himself testified that he specifically gave assurances of confidentiality to litigants and third parties because "otherwise we never would have gotten any of the kind of cooperation without that specific kind of assurance." (April 3, 1990 Hearing Tr. at 42–43, 45). To the extent that *Martindell* requires reliance upon the Protective Orders, that reliance has been demonstrated in this record.

Dow Jones and ALPA next argue that should *Martindell* apply, they have met the *Martindell* standard. They argue that the "extraordinary breadth" of the Protective Orders amounts either to a "showing of improvidence" in the original order or to "extraordinary circumstances." Neither is the case. There is no showing of improvidence where the justifications for the Protective Orders are immediately apparent. The Examiner has alleged that counsel for Eastern, Texas Air and Continental assured him they would not voluntarily produce witnesses or documents unless the information obtained would be kept confidential and used only in the bankruptcy proceedings, and that his investigation would have been at the very least delayed in the absence of the Protective Orders. Nor does the mere breadth of the Protective Orders, by themselves, amount to "extraordinary circumstances." *See Palmieri*, 779 F.2d at 863 (upholding protective order covering "all matters related to discovery"); *City of Hartford*, 942 F.2d at 134 (upholding protective order covering all documents related to settlement "whether or not those documents are contained in the court file"); *Minpeco S.A. v. Conticommodity Services, Inc.*, 832 F.2d 739, 741 (2d Cir.1987) (upholding protective order covering the "fruits of the action's discovery"). "We are unaware of any case in the past half-dozen years of even a modicum of complexity where an umbrella protective order ... has not been agreed to by the parties and approved by the court." *Zenith*, 529 F.Supp. at 889. As noted above, *Agent Orange* does not stand for the proposition that mere breadth of a protective order alone amounts to "extraordinary circumstances."

The burden is on ALPA and IAM to demonstrate "extraordinary circumstances" within the meaning of *Martindell*. This they have not done. The public interest is in the Report and the Examiner's conclusions, not in the Record upon the conclusions are based. Dow Jones' claim that the public requires the Report in order to understand the Record was raised before Judge Lifland and quite properly rejected at that time, for the Report happens to be a perfectly lucid and self-explanatory document. The breadth of the Protective Orders do not constitute extraordinary circumstances given the need for expedition at the time, the nature of the relationships, and the reliance.

> Shapiro's report and summary contained only a portion of the material that was in the depositions and therefore the entire deposition transcripts cannot be said to have been made public. More importantly, we do not see how the examiner could waive the confidentiality rights of the witnesses who testified unless he had authority to act on their behalf. Such authority does not appear in the record before us.

*In re Grand Jury Subpoena*, 945 F.2d at 1225. See also *Minpeco*, 832 F.2d at 743 (upholding protective order covering discovery); *Palmieri*, 779 F.2d at 865 (papers would not have existed but for magistrate's personal assurances of confidentiality);

*H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 106 F.R.D. 551, 556 (S.D.N.Y. 1985); *GAF Corp. v. Eastman Kodak Co.*, 415 F.Supp. 129, 131 (S.D.N.Y.1976); *cf. Westchester Radiological Ass'n, P.C. v. Blue Cross/Blue Shield of Greater New York, Inc.*, 138 F.R.D. 33, 35 (S.D.N.Y. 1991) (testimony and documents provided before protective order was issued).

***The Claims of the Preferred Shareholders Are Derivative***

Both the Preferred Committee and the Individual Preferred Shareholders have filed briefs alleging the claims they seek to assert are not derivative claims and cannot be enjoined by the Bankruptcy Court as part of the Settlement Agreement. Except for the fact that the Individual Preferred Shareholders have alleged breach of fiduciary duty as a separate claim (the Preferred Committee has alleged breach of fiduciary duty, but only as part of their claim that Lorenzo and the other Individual Signatories interfered with contractual obligations) the positions of the two groups of shareholders are identical. The Preferred Shareholders assert that Lorenzo and the other Individual Signatories interfered with contractual rights and fiduciary duties owed them according to their unique status as holders of preferred stock, and that such special injuries make their claims against the Individual Signatories independent and not derivative.

***Definition of Eastern's Estate***

The Bankruptcy Code provides that the bankrupt estate includes "all legal or equitable interests of the debtor in property as of the time of the commencement of the case," 11 U.S.C. §§ 541(a)(1)(1993). The Trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy, *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 429, 92 S.Ct. 1678, 1685, 32 L.Ed.2d 195 (1972) (trustee in Chapter 10 reorganization has no standing to sue indenture trustee on behalf of holders of debentures issued by corporation); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991) (trustee has no standing to bring claims of the creditor noteholders against third party without allegations of damage to corporation); *Cissell v. American Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976) (trustee has no standing against liability insurer on behalf of injured party until right actually exists under policy).

Pursuant to his authority to protect the estate of the debtor, the Trustee "has the duty to marshal the debtor's property for the benefit of the estate, and thus the right to sue parties for recovery of all property available under state law," *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 697 (2d Cir.1989) quoting *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1342 (7th Cir. 1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *In re Teltronics Services, Inc.*, 762 F.2d at 189.

If a cause of action belongs to the estate, creditors may bring such an action only if the Trustee abandons it or otherwise allows the creditors to pursue it independently. 11 U.S.C. § 554; *PepsiCo*, at 701; *Koch*, 831 F.2d at 1346–50. In order to allow the Trustee to assert actions which are property of the debtor's estate for the benefit of the estate as a whole, other claimants may be prohibited by the Bankruptcy Court from pursuing such actions under 11 U.S.C. § 105(a). *PepsiCo*, 884 F.2d at 701; *Koch*, 831 F.2d at 1354; *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1277 (5th Cir.1983); *In re Drexel*, 960 F.2d at 293; *In re Energy Cooperative, Inc.*, 886 F.2d at 924. *See generally In re All American of Ashburn, Inc.*, 805 F.2d 1515 (11th Cir.1986); *Unarco Bloomington Factory Workers v. UNR Indus. Inc.*, 124 B.R. 268 (N.D.Ill.1990), *on remand*, 143 B.R. 506 (N.D.Ill.1992). The Trustee's action is then the only one allowed to go forward, and other claimants are bound by its outcome. *PepsiCo*, 884 F.2d at 701.

A debtor's interests in property, including causes of action, are defined

by state law, and become assets of the estate once the bankruptcy petition is filed, *Butner v. U.S.,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979); *PepsiCo,* at 699; *In re Morton,* 866 F.2d 561, 563 (2d Cir.1989), *Koch,* 831 F.2d at 1343. The Appellees allege that under New York's choice of law principles, claims arising out of corporate internal affairs are governed by the law of the state of incorporation, and the Preferred Shareholders do not dispute this. Since Eastern was incorporated in Delaware, then, the question of whether the Preferred Shareholders' causes of action for breach of fiduciary duty and tortious interference with contract properly belong to the Eastern Estate is a question of whether these actions are independent or derivative actions under Delaware state law.

### *Nature of the Claims under Delaware Law*

A shareholder's action in Delaware is not derived from a right of the corporation if the shareholder alleges "special injury," an action which injures his interests in some manner which differs from the way in which it affects the corporation and other shareholders. *Rabkin v. Philip A. Hunt Chemical Corp.,* 547 A.2d 963, 968 (Del Ch.1986); *Kramer v. Western Pacific Indus., Inc.,* 546 A.2d 348, 353 (Del.1988); *Lipton v. News Int'l, PLC,* 514 A.2d 1075, 1078 (Del Supr.1986); *Moran v. Household Int'l, Inc.,* 490 A.2d 1059, 1070 (Del Ch. 1985), *aff'd,* 500 A.2d 1346 (Del.1985); *Elster v. American Airlines, Inc.,* 34 Del.Ch. 94, 100 A.2d 219 (1953).

A shareholder's injury is "special" and his claim direct if the shareholder alleges "a wrong inflicted upon him alone or a wrong affecting any particular right which he is asserting,—such as his pre-emptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation," *Elster,* 100 A.2d at 222. "[E]xamples of claims giving rise to direct actions are: ... claims that a proposed merger, recapitalization, redemption, or similar transaction unfairly affects minority shareholders," *Rabkin,* 547 A.2d at 969, quoting Finkelstein, *The Delaware Law of Corporations and Business Organizations,* § 13.6.

In *Moran,* the Delaware Court of Chancery stated that the test was either

> an injury which is separate and distinct from that suffered by other shareholders ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control.... Where a shareholder's complaint sets out a cause of action that is both individual and derivative, the shareholder may proceed with the individual action.

*Moran,* 490 A.2d at 1069–70 (citations omitted). The claim for breach of a contractual right, however, must also meet the "special injury" test:

> [W]hile *Moran* serves as a quite useful guide, the case should not be construed as establishing the only test for determining whether a claim is derivative or individual in nature. Rather, as was established in *Elster,* we must look ultimately to whether the plaintiff has alleged "special" injury, in whatever form.

*Rabkin,* 547 A.2d at 968. The court determines whether the creditor has stated a derivative or an individual cause of action based on that nature of the wrongs alleged rather than the shareholder's characterizations of them. *Rabkin,* 547 A.2d at 968; *Kramer,* 546 A.2d at 352; *Lipton v. News Int'l,* 514 A.2d 1075, 1078 (1986); *Elster,* 100 A.2d at 223.

### *Breach of Fiduciary Duty to Preferred Shareholders*

The rights of preferred shareholders under Delaware law are "essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing that contract," *Jedwab v. MGM Grand Hotels, Inc.,* 509 A.2d 584, 594 (Del.Ch.1986). However, unless Eastern's articles of incorporation specifically eliminate such a right, the Preferred Shareholders have standing to assert claims for breach of fiduciary duty against Eastern's management as well. Violation of a specific contractual right be-

longing to preferred shares is a contractual claim which exists alongside, but independent from, the claims for corporate loyalty which all shares of a corporation have unless explicitly excluded from such rights:

> [W]ith respect to matters relating to preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing the contract; where however the right asserted is not to a preference as against the common stock but rather a right shared equally with the common, the existence of such right and the scope of the correlative duty may be measured by equitable as well as legal standards.

*Id.* at 594.

Breach of fiduciary duty by a corporation's officers or directors is usually a claim based on an injury which affects the corporation itself or all shareholders equally, including preferred shareholders. *Jedwab,* 509 A.2d at 593. Several courts, including the chancery court in Delaware, have expressed the view that a breach of fiduciary duty claim is a derivative one as a general proposition. *See, e.g., Rabkin,* 547 A.2d at 969; *MacAndrews and Forbes Holdings, Inc. v. Revlon, Inc.,* No. 8126, 1985 WL 21129 (Del Ch. Oct. 9, 1985).

The Preferred Shareholders have not tried to argue that the Individual Signatories' breach of fiduciary duty did not harm Eastern and its shareholders as a whole. They simply allege that since the Intercorporate Transactions were designed to help Continental Holdings, the majority shareholder of Eastern, the breach of fiduciary duty had the net effect of harming only the Preferred Shareholders, and therefore provides them with the grounds for alleging "special injury." They argue that they must have suffered "special injury" because Texas Air, as the sole common stockholder of Eastern, has suffered no injury by repositioning its assets from Eastern to its other wholly-owned airline, Continental. The transfer of assets, therefore, hurts only the Preferred Shareholders' receipt of dividends.

The injury was real, but the injury was to Eastern. Texas Airlines' Eastern stock diminished by as much as the Preferred Shareholders' stock did. That Texas Airlines *qua* Continental shareholder gained as much as Texas Airlines *qua* Eastern shareholder lost does not make it any less a cause of action which accrues to Eastern and only derivatively to its shareholders.

The Delaware Court of Chancery has already considered substantially the same claim in *Weinberger v. Lorenzo,* No. 10692, 1990 WL 156529 (Del.Ch. Oct. 12, 1990) (16 Del J.Corp.L. 1647 (Summer 1991)). In *Weinberger,* a preferred shareholder of Eastern brought a class action naming only Lorenzo, Continental Airlines, and Texas Air as defendants, and based his complaint on the events which form the core of the Preferred Shareholders' complaints here. The Delaware Court of Chancery held the complaint stated only a derivative cause of action and dismissed it for failure to name Eastern, a necessary party.

The Preferred Shareholders here seek to distinguish their claim from that case by stating that the only injury alleged in *Weinberger* was the diminution in the market value of Eastern preferred stock, an allegation which they have not made. They concede that a generalized claim for mismanagement would give rise only to a derivative right, but claim that since they have asserted an injury separate from Eastern's other shareholder, Continental Holdings, *Weinberger* does not govern their case.

However, the Preferred Shareholders do not indicate how the damage done to their shares is different from the damage done to the shares of Eastern owned by Continental Holdings:

> This injury is "special," as the argument goes, because Texas Air, as the sole common stockholder of Eastern, has suffered no injury by repositioning its assets from Eastern to its other wholly owned airline—Continental. The repositioning of assets, therefore, only "really" diminish-

es the value of plaintiff's preferred shares.

*Weinberger,* 1990 WL 156529, at *3.

Texas Air and Continental have not benefited in their capacity as shareholders of Eastern, but as parties to an unfair contract with Eastern. The value of the Eastern stock as it is listed on their corporate balance sheets diminishes as much as the value of this stock in the Preferred Shareholders' portfolios.

> The Eastern preferred shareholders have not been singled out and treated differently than other Eastern shareholders. The essence of Weinberger's claim is that the value of his stock has been reduced due to defendants having caused Eastern's management to deplete or destroy Eastern's corporate assets. Such alleged mismanagement, in fact, reduces the value of Eastern's stock in toto regardless of Weinberger's contention that Texas Air (Eastern's common stockholder) suffers no real injury by shifting its own assets.

*Weinberger,* 1990 WL 156529, at *3. A claim for breach of fiduciary duty based upon acts causing a monetary loss to the corporation cannot, without more, give rise to a claim asserting "special injury" to the shareholder, as distinct from the corporation. "Such a position is contrary to well-established principles of Delaware law," *Kramer,* 546 A.2d at 354 (holding no individual claim for breach of fiduciary duty exists where management deliberately structured merger to harm certain shareholders proportionately more than other parties).

Actions for breach of fiduciary duty become property of the estate which the Trustee alone has the right to pursue after the filing of bankruptcy petition.

> While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of the bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders.

*Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939).

***Contractual Claims by Preferred Shareholders***

The Preferred Shareholders' cause of action for tortious interference with contract as they have asserted it is also a derivative action, for although they have listed the rights unique to their status as preferred shareholders, they have alleged a violation only of their rights to payments by Eastern in the form of preferred dividends and mandatory sinking fund obligations. Although this is a contractual claim, it stems from the damage done to Eastern and affects all owners of Eastern stock. The only other contractual rights they have alleged are the rights of Eastern's preferred stock to receive mandatory sinking fund and liquidation preference payments. Since there are no allegations that the Settlement does not accord with the priorities for the distribution of assets set out in the Bankruptcy Code, and since the Preferred Shareholders have not alleged any breach of their liquidation preferences, the sole claim which they have asserted is a claim that the Individual Signatories tortiously interfered with Eastern's contractual obligations to pay preferred dividends.

To the extent that the Preferred Shareholders are alleging that Eastern is not paying contractual debts owed to them, their creditors' claim against Eastern and its officers and directors is barred by the automatic stay in bankruptcy, 11 U.S.C. § 362(a). The creditor of any bankrupt may allege that the prior dealings of other parties with the bankrupt rendered it insolvent; however, such a claim is for fraudulent conveyance properly brought by the Trustee, not for tortious interference of contract. Claims by creditors against the debtor for fraudulent conveyance cannot be brought as individual causes of action for tortious interference with contact:

> Actions for the recovery of the debtor's property by individual creditors under

state fraudulent conveyance laws would interfere with this estate and with the equitable distribution scheme dependent upon it, and therefore appropriately stayed under section 362(a)(3). Any other result would produce near anarchy where the only discernible organizing principle would be first-come-first-served. Even without the Bankruptcy Code and the policies that support it, we would be reluctant to elevate such a principle to a rule of law.

*In re MortgageAmerica Corp.*, 714 F.2d at 1276. The Second Circuit has approved of a parallel analysis in *PepsiCo*, stating, "[i]f we were to stretch PepsiCo's theory to the limit, the source of any asset ... that was sold to obtain money to pay [the defendant] would" result in a particularized harm to the creditor, and

[t]his, however, is precisely the situation that the Bankruptcy Code was designed to eliminate.... All unsecured creditors are to be treated equally if their injuries are not different in kind. PepsiCo is 'similarly situated to other creditors who have been treated inequitably by the debtor and thus share in the common injury

*PepsiCo*, 884 F.2d at 704, quoting *Koch Refining*, 831 F.2d at 1350. Any suit for the recovery of the diminution of the value of the stock caused by the tortious acts of either an officer or director or third person belongs to the corporation, *In re All American*, 805 F.2d at 1518.

### The Injunction Does Not Apply to Individual Claims

The Preferred Shareholders rely on *Davis v. United States Gypsum Co.*, 451 F.2d 659, 662–63 (3rd Cir.1971), where the Third Circuit held that Davis' rights to individual, non-derivative claims as guarantor of the corporation could not be circumvented by the release ordered by the Bankruptcy Court. This result was hardly surprising, for a bankruptcy court has no subject matter jurisdiction over claims which neither arise nor are related to claims under Title 11. In *In re All American*, 805 F.2d at 1518, the Eleventh Circuit upheld a bankruptcy court injunction precisely because the bankruptcy judge "did not enjoin appellants from pursuing any action which they [might] bring in their own name or for their own benefit." A trustee in bankruptcy has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankruptcy corporation itself. *Caplin*, 406 U.S. at 434, 92 S.Ct. at 1688.

[On the second claim, the only] "question remains whether in the case at hand there is any damage to the *corporation*, apart from that done to the third-party creditor noteholders ... We therefore hold that the trustee lacks standing to bring the second claim, which belongs solely to the creditors.

*Shearson Lehman*, 944 F.2d at 118–19, 120. A trustee may not sue upon claims not belonging to the estate even if they were assigned to him by creditors for convenience or other purposes. *Cissell*, 521 F.2d at 792. The claims being asserted here by the Assignees on behalf of Eastern were not individual claims. The Trustee and Assignees have no standing to bring such.

Finally, the Preferred Shareholders argue that "no basis exists for such extraordinary relief where, as here, the injunction is *permanent* and the parties to be enjoined are expected *receive nothing* from the settlement." This is a function of the priority scheme established by the Bankruptcy code. The fact that the Preferred Stockholders will recover nothing has no bearing on the propriety of the Settlement Agreement.

The Settlement Order states that it settles and releases any claim belonging to the Eastern estate because the claims are based upon damage to the estate:

Any claim against any Individual Signatory of any Corporate Defendant which is predicated upon damage to Eastern or the Eastern Estate that has heretofore or may hereafter be asserted that arises from or related to (a) the Intercorporate Transactions.... or (b) any other claim released by the Eastern Estate ... here

shall be extinguished irrespective of the person or entity asserting the claim or the form or forum in which the claim is asserted.

Settlement Agreement, ¶ 13. As Chief Judge Lifland remarked at the Settlement Hearing, this does not prevent anyone from working up another sets of claims which set forth individual, nonderivative causes of action. The Preferred Shareholders and the other creditors of Eastern remain free to do so.

### Conclusion

For the foregoing reasons, the appeals from the Settlement Order are denied, and the orders are affirmed. ALPA and IAM's motions to vacate the Settlement Order are denied. ALPA's motion to modify or unseal the Protective Order is denied.

The denial of the Preferred Committee's and the Preferred Shareholders' motion to lift the injunction against their claims is also affirmed.

It is so ordered.